# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KNITTING FEVER, INC., | : | |
| DESIGNER YARNS, LTD., | : | |
| FILATURA PETTINATA V.V.G. DI | : | |
| STEFANO VACCARI & C., SION | : | NO. 08-4221 |
| ELALOUF, DIANE ELOUF, JEFFREY J. | : | |
| DENECKE, JR., JAY OPPERMAN, and | : | |
| DEBBIE BLISS, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EISAKU NORO & CO., LTD., | : | |
| KNITTING FEVER, INC., | : | |
| SION ELALOUF, DIANE ELALOUF, | : | NO. 08-4775 |
| and JAY OPPERMAN, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                        September 23, 2010

Currently pending before the Court is a Motion for Summary Judgment filed by Defendants

Knitting Fever, Inc. ("KFI"), Sion Elalouf, Diane Elalouf, Jeffrey J. Denecke, Jr., and Jay Opperman

(collectively, the "KFI Defendants"). For the reasons which follow, the Motion is denied.

## I.    FACTUAL AND PROCEDURAL HISTORY

The factual background of this case is one familiar to both the parties and the Court and has been reiterated in several of this Court's prior opinions.[1] This matter arises between Plaintiff, The Knit With ("TKW"), a small, family-owned and operated business retailing specialty yarns and accessories to consumers, and Defendant Knitting Fever, Inc. ("KFI"), a New York corporation that manufactures and distributes specialty yarns. At the core of the dispute is Plaintiff's claim that KFI sold designer knitting yarns to TKW, representing that the yarns contained a percentage of cashmere, which they allegedly did not.

Plaintiff initiated litigation on September 2, 2008, against KFI, its officers/directors, and several related entities, alleging that, as a consequence of the false labeling of three of the six Cashmerino yarns at issue, its business and commercial interests were harmed. (Compl., The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221 (E.D. Pa. Sep. 2, 2008) ("The Knit With I").) The Complaint set forth several causes of action, including: (1) breach of the express warranty of merchantability; (2) breach of the implied warranty of merchantability; (3) false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (4) injury to business and property pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962; (5) conspiracy to cause injury to business and property pursuant to RICO; (6) perfidious trade practices (deceit) under the common law of unfair competition; and (7) piercing the corporate veil. (Id. ¶¶ 82-150.) Defendants moved, on September 24, 2008, to dismiss the third, fourth, and fifth counts.

On October 6, 2008, prior to the resolution of this motion to dismiss, Plaintiff initiated a second litigation against KFI, also including as Defendants the Japanese manufacturers of the

---

[1] The facts were fully summarized in two December 2008 decisions and, in lieu of repeating them here, the Court incorporates them by reference. See The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2008 WL 5381349, at *1-6 (E.D. Pa. Dec. 18, 2008); The Knit With v. Eisaku Noro, No. CIV.A. 08-4775, 2008 WL 5273582, at *1-3 (E.D. Pa. Dec. 18, 2008).

2

remaining three Cashmerino yarns at issue. (Compl., The Knit With v. Eisaku Noro & Co., Ltd., No. CIV.A.08-4775 (E.D. Pa. Oct. 6, 2008) ("The Knit With II").) The Complaint in that case set forth the following causes of action: (1) breach of express warranty of merchantability of goods for resale to consumers; (2) breach of implied warranty of merchantability of goods for resale to consumers; (3) explicitly false advertising pursuant to the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (4) perfidious trade practices and common law unfair competition; (5) civil conspiracy; and (6) piercing the corporate veil. Defendants filed another motion to dismiss. (Id. ¶¶ 35-82.)

On December 18, 2008, this Court, in The Knit With I, granted the motion to dismiss the Lanham Act claim on standing grounds, but declined to dismiss the RICO claims. The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2008 WL 5381349, at *1-6 (E.D. Pa. Dec. 18, 2008). The following day, the Court also dismissed the Lanham Act claim in The Knit With II. The Knit With v. Eisaku Noro & Co., Ltd., No. CIV.A.08-4775, 2008 WL 5273582 (E.D. Pa. Dec. 19, 2008). By way of Order dated December 23, 2008, both actions were consolidated under the first civil action number.

Following the KFI Defendants' submission of their Answer, Plaintiff moved, on January 22, 2009, to dismiss all counterclaims and strike all affirmative defenses. The Court struck Defendants' fifth affirmative defense, but denied the motion in all other respects.

Via a Motion for Judgment on the Pleadings, filed on July 15, 2009, the KFI Defendants sought dismissal of the entire Complaint. On October 20, 2009, the Court granted the Motion as to Plaintiff's claims of perfidious dealing and civil conspiracy and dismissed these causes of action with prejudice.

Currently pending before the Court is the KFI Defendants' May 18, 2010 Motion for Summary Judgment on the grounds that Plaintiff is not the real party in interest. Plaintiff responded on June 10, 2010, Defendants submitted a Reply Brief on June 22, 2010, and Defendants filed a

3

Sur-reply Brief on July 12, 2010.

## II.   STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."

4

Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## III. DISCUSSION

As noted above, KFI Defendants move for summary judgment on the ground that Plaintiff is not the real party in interest. Specifically, KFI Defendants argue that TKW, as it existed during the time of the transactions challenged by the present Complaint, had no legal identity independent of the late Marguerite Casale, who owned TKW as a sole proprietorship. Because Mrs. Casale passed away on July 4, 2004, and because no Letters of Administration were ever issued and no personal representative ever appointed in connection with her estate, no individual or entity exists to bring the present claim. The KFI Defendants conclude that, given these circumstances, the present form of TKW holds no interest that would be sufficient to render it a "real party in interest" under Federal Rule of Civil Procedure 17.

In order to address this Motion, the Court first summarizes the material facts pertinent to resolution of this Motion, as reflected by the parties' evidentiary submissions. The Court then turns to the legal discussion of whether Plaintiff is legally the real party in interest to the present suit.

5

## A. Material Facts Pertinent to Defendants' Motion for Summary Judgment[2]

TKW was founded by Marguerite Casale as a sole proprietorship in 1971. (Defs.' Mot. Summ. J., Ex. A.) She was the only person identified on the original fictitious name registration as owning or interested in TKW. (Id.) On July 4, 2004, at the age of seventy-four, Mrs. Casale died at her home in Chestnut Hill, Pennsylvania. (Defs.' Mot. Summ. J., Ex B at 10; Pl.'s Opp'n Mot. Summ. J., Ex. 4, Decl. of James Casale, ¶ 14, June, 10, 2010 ("J. Casale Decl.").) She was predeceased by her only husband, Andrew Casale, and was survived by eight children, including James F. Casale and Dawn Casale. (Id.) The challenged transactions between TKW and KFI involving the six yarns at issue in this consolidated action occurred during Mrs. Casale's lifetime and through to the end of 2005.

According to James Casale's Declaration, Marguerite Casale, in 1999, conscious of her advanced age, desired to reorganize TKW as a partnership with James Casale. (Id. ¶ 5.) James assented to such an arrangement, contributed $10,000 to TKW, and the two agreed upon the terms of how TKW would be operated, financed, and managed. (Id. ¶¶ 6-7.) On September 11, 1999, they executed a formal Partnership Agreement, which had been prepared by James, memorializing the terms of their mutual understanding. (Id. ¶¶ 7-8.) Although Plaintiff has produced an unsigned draft of the Partnership Agreement, (Pl.'s Opp'n Mot. Summ. J., Ex. 6), Mr. Casale has averred that the single original of the executed 1999 agreement was lost. (J. Casale Decl. ¶¶ 15-16.) He explained that during the reading of Marguerite Casale's Last Will, on August 14, 2005, the executed Partnership Agreement was openly available for inspection by James Casale's seven siblings. (Id. ¶ 15.) Hours later, after the almost twenty family members present that day had departed, James Casale could not find either the Partnership Agreement or the original Will. (Id.)

---

[2] The Court discusses the admissibility of such evidence later in this opinion.

In March 2002, Marguerite Casale discussed her affairs with her daughter Dawn Casale.
(Pl.'s Opp'n Mot. Summ. J., Ex. 5, Decl. of Dawn Casale, ¶ 5, June 10, 2010 ("D. Casale Decl.").)
According to Dawn, she "was informed that since 1999 The Knit With was organized as a
partnership with [her] brother, James or, as [she calls] him, Jimmy." (Id. ¶ 6.) Prior to this
conversation, however, Dawn had no knowledge that TKW was a partnership, although she recalled
her brother's involvement in the business. (Id.) During that discussion, Marguerite showed Dawn
the Partnership Agreement, which Dawn flipped through, but did not read word for word.[3] (Id. ¶ 7.)
Dawn averred that, through her conversation with Marguerite, she came to understand that her
mother's purpose was to ensure that TKW would continue to operate in the event of her death or
disability. (Id. ¶¶ 8-9.) The Partnership Agreement, as Dawn understood it, called for the
partnership to retain and reinvest profits, allowed for the addition of new partners, permitted both
Marguerite and James to transfer their partnership interests to one of the siblings by way of a
writing, retained the partnership status of the company in the event of one of the partner's deaths,
and effected the transfer of the deceased partner's interest to the remaining partner. (Id. ¶¶ 10-11.)

During the last year of her life, Marguerite executed a series of wills. The first was a
holographic will executed on October 21, 2003, which stated as follows:

Last will and testament

The house and contents to go to my son James Casale.

The shop, business and contents to eventually, when she's ready to go to Dawn
Casale Giompa

The jewelry as marked and Jim to decide about the remaining.

I love all of you.

---

[3] Dawn Casale averred that the Partnership Agreement she saw "appears to be identical" to the
one attached to Plaintiff's brief. (Id. ¶ 7.)

7

(Pl.'s Opp'n Mot. Summ. J., Ex. 7.)

Thereafter, in November, while Marguerite Casale was in Abington Hospital, she recited a

poem for six of her children, which she then hand-wrote, dated, and signed. (D. Casale Decl. ¶ 22.)

On December 8, 2003, Marguerite wrote out another will, incorporating the poem and stated as

follows:

> I, Marguerite Hawco Casale in firm mind made my will to eliminate all wills made
> on November 12, 2003 or prior to that date.
> I haven't any gold to leave when I grow old
> Somehow it passed me by
> I'm very poor but still I leave a precious will when I must say goodbye.
> I leave the sunshine to the flowers
> I leave the springtime to the trees and to the old folks
> I leave the memory of a baby upon their knees
> I leave the night time to the dreamers
> I leave the songbirds to the blind
> I leave the moon above to those in love when I leave this world behind.
> To my daughter [redacted] I leave my Emerald and diamond ring, which she has
> deprived me of for the last 25 years. My estate is not to pay inheritance tax on it.
> To my daughter [redacted] I leave my three confederate notes (Money) and all other
> things she removed from my home. My estate is not to pay inheritance tax on same.
> To My Son [redacted] and [redacted] I leave time. They never had any. Hope they
> put it to good use.
> The balance of all my wordly belongs and possessions of every kind I hereby leave to
> my son James F. Casale.
> I appoint James F. Casale as executor to my will.

(Pl.'s Opp'n Mot. Summ. J., Ex. 7.)

Finally, on June 9, 2004, Marguerite executed a self-attesting will revoking all prior versions

of her will, incorporating a longer version of the poem, and stating, in part, as follows:

> I hereby nominate, appoint and constitute as the Executor of this my Last Will and
> Testament, and grant all available powers to, my very dear and ever so close and
> loving son, confidant and partner, James Francis Casale . . .
> . . .
> I hereby bequeath, bestow and give to my son, JAMES F. CASALE, all those
> possessions which are mine to bestow as well as whatever other property, of every
> kind, nature and description whatsoever and wherever situate, which I possess or of
> which I am solely seised or have any interest therein at the time of my death, whether

8

by title, possession or with power of testamentary disposition . . .

(Pl.'s Opp'n Mot. Summ. J., Ex. 9.)

After Marguerite's death in July of 2004, TKW continued to conduct business with James Casale running all operations. (D. Casale Decl. ¶¶ 31.) TKW continued purchasing goods from KFI through late 2005. (Pl.'s Opp'n Mot. Summ. J., Ex. 10.) After that time, KFI unilaterally terminated its relationship with TKW. (Compl. ¶ 24; Answer ¶ 24.)

Starting in July 2004, Dawn Casale became more active in TKW's business. (J. Casale Decl. ¶ 19.) As a result, in early 2006, James Casale proposed that Dawn become a formal partner in the business – an offer which she declined due to personal issues. (Id. ¶ 20.) On September 11, 2007, however, Dawn Casale and James Casale formally entered into a new Partnership Agreement, thereby making her a full and equal partner in TKW. (Id. ¶ 22.) On July 30, 2008, James Casale and Dawn Casale officially amended the fictitious name registration for TKW to add their names as parties to the registration and to withdraw Marguerite Casale's name. (Defs.' Mot. Summ. J., Ex. C.) Plaintiff has produced no evidence of any transaction between the present form of TKW and KFI involving the six yarns at issue.

**B.    Whether TKW is the Real Party in Interest in this Case**

The question now before the Court is whether these facts give rise to a finding or, at minimum, a plausible inference that Plaintiff TKW is a real party in interest to the case. "The concept of a real party in interest is akin to the concept of standing, in that both address a party's right to pursue an action as claimant." 4 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE, § 17.10[1] (3d ed. 2010) (internal references omitted). Standing is a jurisdictional limitation that examines whether the plaintiff has alleged that she suffered an injury caused by the defendant that is redressable by the Court. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). The

9

real party in interest rule, on the other hand, is a prudential limitation on a federal court's power to hear cases and holds that a litigant cannot sue in federal court to enforce the rights of third parties.[4] Rawoof v. Texor Petrol. Co. Inc., 521 F.3d 750, 756-57 (7th Cir. 2008); see also Tate v. Snap-On Tools Corp., No. CIV.A.90-4436, 1997 WL 106275, at *4 (N.D. Ill. Feb. 11, 1997) ("whereas standing turns on whether the plaintiff can show an injury in fact traceable to the conduct of the defendant and likely to be redressed by the relief sought, designation of the real party in interest entails identifying the person who possesses the particular right sought to be enforced."); In re Herley Indus. Inc. S Litig., No. CIV.A.06-2596, 2009 WL 3169888, at *7 (E.D. Pa. Sep. 30, 2009) (same). The purpose of the real party in interest doctrine is "simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." FED. R. CIV. P. 17 advisory committee's notes (1966).

The real party in interest doctrine is codified by Rule 17 of the Federal Rules of Civil Procedure, which states:

> An action must be prosecuted in the name of the real party in interest. The following may sue in their own names without joining the person for whose benefit the action is brought:
> (A) an executor;
> (B) an administrator;
> (C) a guardian;
> (D) a bailee;
> (E) a trustee of an express trust;
> (F) a party with whom or in whose name a contract has been made for another's benefit; and
> (G) a party authorized by statute.

---

[4] As defined in Black's Law Dictionary, a real party in interest is a "[p]erson who will be entitled to benefits of action if successful, that is, the one who is actually and substantially interested in subject matter as distinguished from one who has only a nominal, formal, or technical interest in or connection with it." BLACK'S LAW DICTIONARY 1264 (6th ed.1990).

FED. R. CIV. P. 17(a). "[W]hile the question of in whose name a suit must be brought is procedural," and thus governed by federal law, "that question must be answered with reference to substantive state law." Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 407 F.3d 34, 48 (2d Cir. 2005) (emphasis omitted). Rule 17(a) "assumes that the applicable substantive law gives the persons named in the rule the right to sue." 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1543 (3d ed. 2010); see also Stichting, 407 F.3d at 48-49 & n.7. Conversely, "anyone possessing the right to enforce a particular claim is the real party in interest even if that party is not expressly identified in the rule." 6A WRIGHT, MILLER & KANE, supra § 1543.

Given these legal precepts, the Court considers the substantive law for each of the claims remaining in this case. With respect to the breach of express and implied warranty claims, Pennsylvania law controls. Under Pennsylvania law, express warranties belong to the buyer of the goods and are created as follows:

(1) Any affirmation of fact or promise made by the seller *to the buyer* which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

13 PA. CONS. STAT. § 2313(a)(1) (emphasis added). Likewise, the implied warranty of merchantability, as described in the Uniform Commercial Code ("U.C.C.") and adopted by Pennsylvania, is "'a warranty that the goods will pass without objection in the trade and are fit for the ordinary purposes for which such goods are used.'" Davenport v. Medtronic, Inc., 302 F. Supp. 2d 419, 434 (E.D. Pa. 2004) (quoting Borden, Inc. v. Advent Ink Co., 701 A.2d 255, 258 (Pa. Super. Ct. 1997)). The warranty "'serves to protect *buyers* from loss where the goods purchased are below commercial standards.'" Id. (quoting Hornberger v. Gen. Motors Corp., 929 F. Supp. 884, 888

11

(E.D. Pa. 1996)) (emphasis added). Finally, as to the RICO claims, federal statutory law provides that suit may be brought only by "[a]ny person injured in his business or property" by reason of the RICO violation. 18 U.S.C. § 1964(c); see also In re Sunrise Secs. Litig., 916 F.2d 874, 882 (3d Cir. 1990).

In the present matter, the KFI Defendants contend that Marguerite Casale originally founded TKW in 1971 as a sole proprietorship, with no evidence that its status ever changed during her lifetime. All of the challenged yarn transactions occurred with that entity, thereby making it the real party in interest under the state substantive law. The KFI Defendants go on to assert that the current form of TKW, formed in 2007, was not a party to any of the transactions at issue in this case, nor is there any evidence of record establishing that this partnership is the assignee or successor-in-interest to any claims of Mrs. Casale's estate. Thus, they assert that any claims for breach of warranty or RICO violations belong solely to Mrs. Casale or a personal representative of her estate – a position for which no one has been appointed by the Register of Wills. In turn, the Pennsylvania partnership that is now identified as Plaintiff TKW in this action has no actual or substantial interest in this case.

Plaintiff's response to this contention is four-fold. First, it asserts that KFI Defendants have waived any real party in interest objection by their inexcusable delay. Second, it contends that a 1999 partnership was formed by Marguerite Casale and James Casale, was continued by James after Marguerite's death, and is the predecessor-in-interest to Plaintiff. Third, it alleges that, even assuming the Court does not deem the 2007 partnership to be a successor-in-interest to the 1999 partnership, the 1999 partnership was continued by James alone following Marguerite Casale's 2004 death, and James may be substituted as the real party in interest under Rule 17. Finally, even if the Court finds that TKW remained a sole proprietorship at the time of Mrs. Casale's death, her Last

12

Will and Testament devised all of her personal property, including her interest in TKW, to James Casale, who again may be substituted as the real party in interest. The Court takes each argument individually.

### 1.    Whether the KFI Defendants Waived Their Rule 17 Argument

Plaintiff first argues that Defendants knew or should have known the facts underlying their current challenge and raised this claim earlier. It contends that, as of October 19, 2006, KFI was on notice that TKW was no longer a sole proprietorship of Marguerite. As such, it asserts that the KFI Defendants' failure to raise its real party in interest argument over the long course of this case now constitutes a waiver of that issue.

"The real party in interest defense is 'for the benefit of a defendant, and should be raised in timely fashion or it may be deemed waived.'" Nikimiha Secs. Ltd. v. Trend Group Ltd., 646 F. Supp. 1211, 1224 (E.D. Pa. 1986) (quoting Audio Visual Mktg. Corp. v. Omni Corp., 545 F.2d 715, 719 (10th Cir. 1976)). "'Otherwise, the court may conclude that the point has been waived by the delay and exercise its discretion to deny motions on the ground of potential prejudice.'" Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1431 (3d Cir. 1994) (quoting 6A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1554, at 407-08 (1990)). Generally, however, courts have only found waiver where the issue was first raised either in pretrial, trial, or post-trial motions. Compare Gogolin & Stelter v. Karn's Auto Imports, Inc., 886 F.2d 100, 102-03 (5th Cir. 1989) (holding that defendant waived real-party-in-interest defense by "untimely assertion," where defendant raised it for the first time in a motion for directed verdict), cert. denied, 494 U.S. 1031 (1990); Nikimiha Secs., 646 F. Supp. at 1224 (finding defense waived when raised for first time during trial) with Stichting, 407 F.3d 34, 45 (2d Cir. 2005) (finding no waiver of real party in interest objection since it was raised before trial, even though more than three years of

13

litigation occurred in which the validity of an assignment never was questioned); Walker Mfg., Inc. v. Hoffmann, Inc., 220 F. Supp. 2d 1024, 1029 (N.D. Iowa 2002) (finding that although the objection should have been raised sooner, the real party in interest objection was raised well before trial and, in that respect, the objection was timely); In re Vitamins Antitrust Litig., No. CIV.A.99-197, 2001 WL 755852, at *3 n.5 (D.D.C. June 7, 2001) (noting that courts have generally only found waivers where the objections were raised during pretrial proceedings or on the eve of trial).

In the present matter, the Court does not deem the KFI Defendants' real party in interest objection waived. Although this case has been the subject of several motions to dismiss and motions for judgment on the pleadings, discovery has not yet closed and the parties have just begun summary judgment proceedings. Plaintiff has admitted that it repeatedly thwarted all of Defendants' attempted discovery into TKW's prior organizational forms. (Pl.'s Opp'n Mot. Summ. J. 9-10.) Moreover, as averred by the KFI Defendants, Plaintiff did not produce a copy of Marguerite Casale's June 2004 Will until only recently. (Defs.' Reply Br. 13.) Finally, this case is not in pre-trial stages and a trial date has yet to be set, making it distinguishable from all of the cases cited by Plaintiff.[5] Although the KFI Defendants might have, perhaps, acted more expediently, the Court does not find their Rule 17 argument waived.

---

[5] See In re Signal Int'l LLC, 579 F.3d 478, 488 (5th Cir. 2009) (finding waiver where party did not move to dismiss for lack of the real party in interest until the eve of trial and first raised a legal challenge to real party in interest in the pretrial order); Allegheny Int'l, 40 F.3d at 1431 (3d Cir. 1994) (finding waiver where party did not raise it until second motion for summary judgment at trial); Resurgence Props., Inc. v. W.E. O'Neil Constr. Co., No. CIV.A.92-6618, 1995 U.S.Dist. LEXIS 9468, at *17 (N.D. Ill. Jul. 10, 1995) (finding waiver where party raised real party in interest objection only a few weeks prior to the date for submission of the final pre-trial order).

## 2. Whether the 2007 Partnership Between Dawn and James Casale is the Successor-in-Interest to a Partnership Created in 1999 by Marguerite and James Casale

TKW's second, and perhaps more important, argument asserts that Plaintiff TKW, in its 2007 partnership form, is the successor-in-interest to the alleged TKW partnership as it existed from 2001 to 2006, when all of the challenged transactions occurred. To resolve this issue, two separate inquiries are necessary. First, the Court must consider the highly disputed question of whether Marguerite Casale and James Casale entered into a partnership in 1999, or whether TKW remained the sole proprietorship of Marguerite Casale until her death. Second, in the event such a 1999 partnership existed, the Court must determine whether the 2007 partnership between Dawn and James Casale which is the present Plaintiff to this action – is the successor-in-interest to that 1999 partnership.

### a. Whether Marguerite Casale and James Casale Entered into a Partnership in 1999 With Respect to TKW

To properly address the first inquiry, the Court must return to the organizational history of TKW, as summarized above. Neither party disputes that Marguerite Casale founded TKW as a sole proprietorship. Rather, the primary point of contention is whether Marguerite Casale reorganized TKW as a partnership with James Casale in 1999. As noted above, the KFI Defendants claim that the TKW, which conducted business with KFI from 2001 to 2006, was always the sole proprietorship of Marguerite Casale, making her estate the proper party in this case. Plaintiff, on the other hand, contends that TKW was reformed into a partnership as of 1999.

Under Pennsylvania law, the existence of a partnership is a question of fact. Abel v. Am. Art Analog, Inc., 838 F.2d 691, 695 (3d Cir. 1988) (citing Silco Vending Co. v. Quinn, 461 A.2d 1324, 1326 (Pa. Super. Ct. 1983)). "A partnership is an association of two or more persons to carry

15

on as co-owners a business for profit." 15 PA. CONS. STAT. § 8311(a). "According to Pennsylvania case law, a partnership is created by a contract, express or implied. The partnership agreement need not be in writing, but, whether in writing or not, or whether express or implied, must be composed of the clear, mutual assent on the part of two or more persons." In re Jackson, 28 B.R. 562-63 (Bankr. E.D. Pa. 1983) (citing Murphy v. Burke, 311 A.2d 904 (Pa. 1973)); see also Leprino Foods Co. v. Gress Poultry, Inc., 379 F. Supp. 2d 650, 655 (M.D. Pa. 2005) ("To determine if a partnership exists, there must be 'clear, mutual assent on the part of two or more persons' to form a partnership."). "The partnership agreement may be made orally, or it may be found to exist from all of the attending circumstances." Leprino Foods, 379 F. Supp. 2d at 655. Testimony coming directly from purported partners in the alleged partnership may, under some circumstances, be sufficient to prove the existence of a partnership, so long as those verbal representations evidence the clear, mutual assent necessary under Pennsylvania law. Jackson, 28 B.R. at 563. Moreover, a partner's commitment to a partnership "may be established merely by conduct which manifests an intention that a party be considered a partner." In re Labrum & Doak, 227 B.R. 391, 407 (Bankr. E.D. Pa. 1998); see also Murphy, 311 A.2d at 907 (Pa. 1973) (partnership agreements "may be made orally or may be found to exist by implication from all attending circumstances (i.e., the manner in which the alleged partners actually conducted their business, etc.)."). "The burden of proof lies with the party or parties seeking to prove the existence of a partnership." Jackson, 28 B.R. at 563 (citing Zuback v. Bakmaz, 29 A.2d 473 (Pa. 1943)).

To establish the existence of a partnership between Marguerite Casale and James Casale in 1999, Plaintiff points to several pieces of evidence. First, via his 2010 Declaration, James Casale has averred that he and Marguerite Casale agreed to enter into a partnership in 1999. (J. Casale Decl. ¶¶ 5-6.) Second, Plaintiff references the Declaration of Dawn Casale, who both echoes some

16

of the discussions with her mother regarding the 1999 partnership between Marguerite and James, and speaks to James Casale's manner of conducting business as a functional partner of TKW. (D. Casale Decl. ¶¶ 6-11.) Finally, Plaintiff produces an unsigned Partnership Agreement allegedly entered into between Marguerite and James.[6] The KFI Defendants respond to these arguments with numerous evidentiary objections. Accordingly, the Court first analyzes the admissibility of each piece of evidence and then turns to whether, in light of the admissible evidence, there is a genuine issue of material fact as to the existence of the 1999 partnership.

### i. Declaration of James Casale

In his Declaration, dated June 10, 2010, James Casale averred as follows:

5. In 1999, Marguerite Casale attained the age of 70 and desired to reorganize The Knit With as a partnership.

6. I agreed to enter into a partnership with my mother to provide for the continuity of The Knit With in the event of her disability or death. In connection with this agreement, I initially contributed $10,000 to The Knit With.

7. The terms of how The Knit With would be operated, financed and managed as a partnership – including such matters as the contributions of each partner, the nature, manner and character of the business, to be transacted, the authority of the managing partner, the disposition of profits, the admission of new partners, the withdrawal of partners, the assignment of partnership interests to either the remaining partners or a non-partner in the event the assignee is familially related to all remaining partners and the continuation of the partnership as a partnership of one in the event of the withdrawal or death of a partner and the retention of reinvestment of profits – were agreed upon.

---

[6] Although the KFI Defendants assume that Plaintiff offers Marguerite Casale's wills as evidence of the 1999 partnership, Plaintiff clarifies, in its Sur-reply Brief, that it does not offer the wills for that purpose. Accordingly, the Court does not address Defendants' contention that such wills are not probative of the issue at hand.

17

8.   I prepared the form of a formal partnership agreement according to the terms agreed upon.  The Partnership Agreement was executed September 11, 1999 in singular form by Marguerite and myself although a counterpart was prepared.  These documents were maintained in the files of The Knit With until shortly before June 9, 2004.

(J. Casale Decl. ¶¶ 5-8.)

The KFI Defendants lodge objections to Mr. Casale's statements under both the hearsay rules and Pennsylvania's Dead Man's Act.  First, to the extent that James Casale avers, in paragraph five, that Marguerite Casale desired to reorganize The Knit With as a partnership, Defendants contend that this is an out-of-court statement offered for the truth of the matters asserted therein, making it inadmissible hearsay.  (Defs.' Reply Br. 8.)

Plaintiff, however, correctly notes that such an averment falls within an exception to the hearsay rules as a "then-existing" statement of Mrs. Casale's desire, plan or intent in 1999 to organize TKW as a partnership.  Federal Rule of Evidence 803(3) states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness
>
> . . .
>
> (3) Then existing mental, emotional, or physical condition.  A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

FED. R. EVID. 803(3).  "The rule is now firmly established that '[t]here are times when a state of mind, if relevant, may be proved by contemporaneous declarations of feeling or intent.'" United States v. Hernandez, 176 F.3d 719, 726-27 (3d Cir. 1999) (quoting Shepard v. United States, 290 U.S. 96, 104 (1933).  "Three requirements must be satisfied for a statement to be admissible under

18

the state of mind exception to the hearsay rule: the statement must be contemporaneous with the mental state sought to be shown; there must be no circumstances suggesting a motive for the declarant to misrepresent her thoughts; and the declarant's state of mind must be relevant to an issue in the case." Phillips v. Potter, No. CIV.A.07-815, 2009 WL 3271238, at *3 (W.D. Pa. Oct. 9, 2009) (citing 5 JACK A. WEINSTEIN & MARGARET A, BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 803.05 (2007)). "Statements admitted under Fed. R. Evid. 803(3) to show the declarant's intent or plan may be used to show that the declarant acted in accord with that plan." United States v. Donley, 878 F.2d 735, 738 (3d Cir. 1989). "However, the scope of this exception must be limited to prevent it from devouring the rule. Thus, '[s]tatements that are considered under . . . the 'state of mind' exception, cannot be offered to prove the truth of the underlying facts asserted.'" Hernandez, 176 F.3d at 727 (quoting Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1274 (3d Cir. 1995)). In other words, statements that tend to prove the declarant's intent or state of mind regardless of the underlying truth are admissible, whereas statements that tend to prove the truth of the fact remembered are not admissible. See Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc., 623 F. Supp. 2d 518, 531 (D. Del. 2009).

Marguerite Casale's statements to James Casale regarding her desire to reorganize TKW as a partnership arguably describe a state of mind as defined under Rule 803(3). Undoubtedly, Mrs. Casale's state of mind is relevant to this case, as Pennsylvania law requires a showing of clear mutual assent to form a partnership. Moreover, while Mr. Casale's statement as to Marguerite Casale's intent is not a clear repetition of a specific statement, it is a recitation or summary of statements made to him in connection with contemporaneous events. Plaintiff offers these statements, not for the truth of the matter asserted or to establish facts remembered – *i.e.* that a

partnership existed – but to show her present intention to form a partnership. Her statements spoke forward to a desire to act, and not backward to an action already taken. See Shepard v. United States, 290 U.S. 96, 105-06 (1933) (distinguishing between forward facing and backward facing testimony). Finally, no circumstances exist that suggest a motive for Marguerite Casale to misrepresent her thoughts. Accordingly, the Court deems paragraph five of Mr. Casale's Declaration admissible, under Rule 803(3), for purposes of establishing Marguerite Casale's intent to form a partnership.

Alternatively, the KFI Defendants object to James Casale's Declaration under the Dead Man's Rule. Pennsylvania's Dead Man's Act states:

> Except as otherwise provided in this subchapter, in any civil action or proceeding, where any party to a thing or contract in action is dead, or has been adjudged a lunatic and his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record who represents his interest in the subject in controversy, neither any surviving or remaining party to such thing or contract, nor any other person whose interest shall be adverse to the said right of such deceased or lunatic party, shall be a competent witness to any matter occurring before the death of said party or the adjudication of his lunacy . . .

42 PA. CONS. STAT. § 5930.[7] "The underlying policy is 'to prevent the injustice which might flow from permitting the surviving party to an occurrence to testify favorably to himself and adversely to the decedent, which testimony decedent's representative would be in no position to refute.'" Bacon v. Riva, No. CIV.A.92-2498, 1993 WL 4132 at *2 (E.D. Pa. Jan. 4, 1993) (quoting Perlis v. Kuhns, 195 A.2d 156, 158 (Pa. Super. Ct. 1963)). "Under this act, in order to find a surviving party's

---

[7] Notably, the Pennsylvania Dead Man's Act applies in a federal diversity case where state substantive law controls, but does not apply to a claim under federal law. Savarese v. Agriss, 883 F.2d 1194, 1200 n.10 (3d Cir. 1989); In re Capital Center Equities, 137 B.R. 600, 607 n.1 (E.D. Pa. 1992).

interest adverse to the one who is dead, three conditions must exist: (1) the deceased must have had an actual right or interest in the matter at issue; (2) the interest of the witness – not simply the testimony – must be adverse; and (3) a right of the deceased must have passed to a party of record who represents the deceased's interest." Keegan v. Fahnestock & Co., Inc., No. CIV.A.95-5998, 1996 WL 530000, at *5 (E.D. Pa. Sep. 16, 1996). The Dead Man's Act is an exception to the general rule of evidence in the federal courts and in Pennsylvania that every person is competent to testify as a witness. Mt. Airy Ins. Co. v. Thomas E. Angst & Assoc., P.C., 954 F. Supp. 1040, 1043 (E.D. Pa. 1997). Accordingly, both commentators and courts have construed its application narrowly. Id.

In this matter, the KFI Defendants do not make the crucial showing necessary to exclude James Casale's Declaration under the Dead Man's Rule – that of adversity. Defendants have failed to demonstrate that James Casale bears any interest adverse to that of Marguerite Casale. Quite to the contrary, and according to the only evidence of record, James Casale is effectively Marguerite's sole beneficiary and executor. Far from acting against the interest of her estate, Mr. Casale now brings a claim against third parties on behalf of a business owned at least in part by her. Given the absence of any showing of adversity, together with the narrow construction typically accorded to this Rule, the Court declines to find James Casale incompetent to testify.

### ii. Declaration of Dawn Casale

Dawn Casale, James's sister and Marguerite's daughter, similarly provided a Declaration as to conversations with her mother regarding the alleged formation of the 1999 partnership, as follows:

5.    In March 2002, during a visit after my mother came home from a short

emergency hospital stay, she discussed her affairs with me.

6.  I was informed that since 1999 The Knit With was organized as a partnership
    with my brother, James or, as I call him, Jimmy. Prior to this, I had no
    knowledge The Knit With was a partnership although I knew my brother
    often paid my mother's buying trips, operated the business, made orders with
    suppliers, could pay the business' bills, regularly did the business' banking
    and was apparently familiar with all aspects of the business. At the time, I
    recalled instances where my brother inspected checks written by my mother
    against the business account prior to her presenting the same to either me or
    another person and my brother visibly agreeing with the checks written by my
    mother.

7.  During this discussion, my mother displayed to me a lengthy document which
    she referred to as a partnership agreement. I paged through the document,
    looked at some sections but did not read the document word for word. The
    document identified as the Articles of Partnership between Marguerite Hawco
    Casale and James F. Casale attached to my brother's declaration appears to be
    identical to the document my mother showed me.

8.  My mother explained to me her reasons in organizing the partnership with my
    brother.

9.  I understood my mother's purpose was to assure The Knit With would
    continue to operate in the event of her disability or death.

10. I understood the agreement called for the partnership to retain and reinvest
    profits.

11. I understood the agreement allowed for new partners and that both my mother
    and my brother could transfer their own partnership interest to one of my
    siblings provided the transfer was made in writing in some way. I also
    understood that in the event of the death of either, business would pass to the
    remaining partner but remain a partnership.

12. My mother was undecided whom, if anyone, would receive her interest in
    The Knit With.

13. I understood the partnership was formed with my brother because he had, over the years, contributed time, effort and money to The Knit With and had learned the business.

14. I also understood the partnership required The Knit With to continue under the same name at the same location and in the same manner but my mother and brother were equal partners.

(D. Casale Decl. ¶¶ 5-14.)

Again, KFI Defendants seek to exclude these statements as hearsay and Plaintiffs invoke Federal Rule of Evidence 803(3). Unlike with James Casale's Declaration, however, the Court does not find that paragraphs six and eight to fourteen of Dawn Casale's Declaration fall within the specified hearsay exception. As the advisory committee notes to Rule 803 explain:

> The exclusion of "statements of memory or belief to prove the fact remembered or believed" is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference for the happening of the event which produced the state of mind.

FED. R. EVID. 803 advisory committee's note (1972). The Third Circuit has thus held that hearsay statements offered pursuant to Rule 803(3) cannot be introduced to prove the truth of the underlying facts asserted. Callahan v. A.E.V., Inc., 182 F.3d 237, 252 (3d Cir. 1999) (quoting Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1274 (3d Cir. 1995)). Rather, "[f]or a hearsay statement to be admissible under Rule 803(3), the statement must occur 'contemporaneous with the state of mind sought to be proved,' and the party 'must not have had time to reflect and possibly fabricate or misrepresent his thoughts.'" Hussey v. Chase Manhattan Bank, No. CIV.A.02-7099, 2005 WL 1787571, at *7 (E.D. Pa. 2005) (quoting United States v. Reyes, 239 F.3d 722, 743 (5th Cir. 2001)).

23

Although Dawn Casale purports to testify about her mother's intentions with respect to organizing TKW as a partnership, her statements lack the one element present in James Casale's declaration – contemporaneity. Marguerite Casale's statements related not her desire or intent to form a partnership, but rather the fact that she actually formed a partnership with James Casale in 1999. Such statements are not contemporaneous with Marguerite Casale's intent or state of mind, but instead are offered to prove the truth of a fact remembered. Accordingly, the Court does not find Dawn Casale's statements regarding conversations with her mother to be admissible under Federal Rule of Evidence 803(3).

In an alternative effort to admit Dawn Casale's statements, Plaintiff contends that paragraphs nine through fourteen are not hearsay because they do not purport to offer into evidence any underlying statements by Mrs. Casale to prove the truth of the matter asserted. Rather, such statements "explain only Dawn Casale's understanding of the formation of the TKW partnership, as explained by her mother." (Pl.'s Sur-reply Br. 4.) Plaintiff's argument, however, is nothing more than a play on words designed to end-run the hearsay rules. Dawn Casale had no personal understanding or knowledge of the partnership arrangement other than what was told to her by Marguerite Casale. Because her Declaration does not purport to speak as to any of her own experiences, it falls squarely within the definition of hearsay.[8]

---

[8] The cases cited by Plaintiff do nothing to bolster its argument. In Citizens Fin. Group, Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 133 (3d Cir. 2004), the Third Circuit found that the witnesses were testifying to their own personal experiences with customers at the bank, not about out-of-court statements asserted for their truth, which was not inconsistent with Rule 801(c). Moreover, the testimony about the actual behavior of the customers was not hearsay. Id. at 133. Likewise, in Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 89 (3d Cir. 2001), the Third Circuit deemed admissible a memorandum authored by the plaintiff's employee stating his understanding of the parties' agreement. Notably, however, the Court did not consider whether the memorandum was hearsay, only whether it was admissible under the parol evidence rule – an

24

Notwithstanding the foregoing conclusions, however, the Court acknowledges that Dawn Casale's statements regarding James Casale's participation in TKW (contained in paragraphs six and eighteen) are admissible since they are based on her own personal knowledge. As noted above, Dawn Casale testified that although she did not know that TKW had been organized as a partnership since 1999, she did recall that her brother effectively operated TKW and was familiar with all financial aspects of the business – often approving expenditures made by Marguerite Casale, arranging and financing Marguerite's attendance at an annual trade show, and taking overall control of the business. (D. Casale Decl. ¶¶ 6, 18.) Such testimony is based on her own observations and goes directly towards proving whether a partnership existed. See In re Labrum & Doak, 227 B.R. at 407 (noting that a partner's commitment to a partnership "may be established merely by conduct which manifests on intention that a party be considered a partner").

### iii. The Unsigned Partnership Agreement

Third, as evidence of the alleged partnership between Marguerite Casale and James Casale, Plaintiff provides the Court with an unsigned draft of the 1999 Partnership Agreement. (Pl.'s Opp'n Mot. Summ. J., Ex. 6.) This document, dated September 11, 1999, sets forth precisely how the partnership, known as The Knit With, was to be operated, financed, named, dissolved, managed, continued in the event of one partner's withdrawal, and otherwise conducted. (Id.) As averred by James Casale, however, the original of this agreement is no longer available. He explained as follows:

> On August 14, 2005, the Last Will executed June 9 was read at a gathering of my mother's seven children, certain of their spouses and her several grandchildren.

_____

issue not present in this case. Id.

25

Almost 20 persons were present at this gathering. The reading of the Will took place in an upstairs parlor at which only my mother's seven children were present; a copy of the Last Will was provided to each of my siblings. The executed original Last Will and the executed Partnership Agreement were openly available for inspection by my siblings; copies of the October 21 instrument were also available. Following this reading, distribution of my mother's gifts to her children and grandchildren occurred – in the upstairs parlor and other common areas of the house both upstairs and downstairs in my mother's bedroom. In connection with this distribution, I was required to go outside in the gardens to resolve a conflict involving two of my adult nephews who are cousins to each other. Hours later and after my family had departed, I returned to the upstairs parlor to retrieve the Original Will and Partnership Agreement for re-filing; both documents could not be found.

(J. Casale Decl. ¶ 15.)

KFI Defendants now contend that, under Pennsylvania law regarding lost instruments, this document is not admissible to prove that the document was executed and formalized as a contract. (Defs.' Mem. Supp. Mot. Summ. J. 7 (citing Hacker v. Price, 71 A.2d 851 (Pa. Super. Ct. 1950); Compass Tech. v. Tseng Lab., 71 F.3d 1125, 1133 (3d Cir. 1995)).) In these cases, Pennsylvania courts held that "[t]o recover on an instrument, the original of which has been lost, the burden of proving the loss of the original and that a diligent, bona fide and thorough search was made without success is upon the one offering secondary evidence." Hacker, 71 A.2d at 853 (citations omitted). "He is also required to prove its former existence, execution, delivery and contents. The evidence to sustain these averments must be clear and convincing." Id. (citations omitted). "Whether the party offering secondary evidence has met this burden of proof successfully is a matter to be determined by the trial court and rests largely in the court's discretion which will not be disturbed on appeal unless there is a manifest abuse thereof." Id.

Defendants' reasoning fails, however, in the simple fact that Plaintiff does not seek to recover against the KFI Defendants on the Partnership Agreement or any term thereof. Rather, the

production of the Partnership Agreement goes only to whether there was "clear, mutual assent" sufficient to evidence intent to form a partnership. Accordingly, the Pennsylvania rules regarding lost instruments are inapplicable.

Nor is the document excludable under the so-called best evidence rule. Federal Rule of Evidence 1002 states that, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." FED. R. EVID. 1002. Rule 1004 goes on to state, however, that:

> The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if –
>
> **(1) Originals lost or destroyed.** All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or
>
> **(2) Original not obtainable.** No original can be obtained by any available judicial process or procedure; or
>
> **(3) Original in possession of opponent.** At a time when an original was under the control of the party against whom offered, that party was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing, and that party does not produce the original at the hearing; or
>
> **(4) Collateral matters.** The writing, recording or photograph is not closely related to a controlling issue.

FED. R. EVID. 1004.

In this case, Plaintiff offers the Declaration of James Casale, who averred that the original, signed Partnership Agreement was misplaced or taken during the reading of Marguerite Casale's Will. (J. Casale Decl. ¶¶ 15-16.) There is no evidence of destruction in bad faith. Moreover,

27

Plaintiff presented significant evidence that the executed Partnership Agreement did, at one point, exist. Mr. Casale indicated that he and Marguerite Casale agreed to the terms of the Partnership Agreement, executed it on September 11, 1999, and maintained that document in TKW files until shortly before June 9, 2004. (Id. ¶ 8.) Dawn Casale likewise testified that she viewed the executed Partnership Agreement sometime in March 2002 and that it appeared identical to the document now produced to the Court.[9] (D. Casale Decl. ¶ 7.) Finally, and perhaps most importantly, in accordance with Fed. R. Evid 1004(4), the actual contents of the Partnership Agreement are not related to a controlling issue in this case. Rather, this case concerns breach of warranty and RICO violation claims with respect to transactions between Defendant KFI and Plaintiff TKW. The Partnership Agreement is only relevant to establish Marguerite Casale's intent to enter into a partnership in 1999 and to ensure that current Plaintiff TKW is, in fact, the real party in interest. To that end, only its existence, and not the specifics of its contents, are crucial. Therefore, the Court deems the unexecuted Partnership Agreement admissible and relevant to a determination of whether the 1999 partnership was formed.

### iv. Conclusion as to Existence of the 1999 Partnership

Given the Declaration of James Casale, Dawn Casale's admissible statements, and the unsigned copy of the Partnership Agreement between Marguerite Casale and James Casale, the Court finds that a genuine issue of material fact is present as to the existence of the 1999 partnership. Clear evidence suggests that in 1999, Marguerite Casale expressed her assent to enter into a partnership with James Casale in order to carry on the business of TKW. James Casale

---

[9] Unlike her statements as to conversations with her mother, Dawn Casale's averments that she saw and skimmed through an executed version of the Partnership Agreement are based on her own personal recollection of events.

agreed to this proposal and, together, the two entered into a written Partnership Agreement. Dawn Casale averred that James then proceeded to function in a manner that evidenced his status as a partner in TKW.

The KFI Defendants fail to counter these facts with any contrary evidence suggesting that TKW continued as a sole proprietorship in Marguerite Casale's name.[10] Considering the evidence in the light most favorable to Plaintiff, a reasonable factfinder could rationally conclude that the 1999 partnership was in place.[11]

### b. Whether the 2007 Partnership Between Dawn and James Casale is the Successor-in-Interest to the 1999 Partnership

The Court's inquiry, however, does not end at this juncture. Rather, we must now determine

---

[10] The KFI Defendants make a final argument that Plaintiff has not offered any fictitious name registration amendments, any partnership tax returns for The Knit With, any partnership financial statements, or any K-1's or other schedules reflecting partners' income for any of the years in which Plaintiff claims such a partnership existed. They go on to argue that the absence of such evidence creates the likely inference that no such partnership existed.

This argument fails on two grounds. First, Defendants concede that not every partnership generates all of these types of documents. Accordingly, their absence does not firmly establish the non-existence of a partnership. Moreover, although the absence of these documents may, in fact, create an inference of no partnership, the Court is required, on summary judgment review, to draw all inferences in favor of the non-moving party.

[11] Plaintiff argues that even if the Court were to find that TKW was unequivocally operated as the sole proprietorship of Marguerite Casale at the time of her death, James Casale could be substituted as the plaintiff since Marguerite's June 2004 Will appointed James as the Executor of her estate and Federal Rule 17(a)(1)(A) permits an executor of an estate to act, in his own name, as the real party in interest on behalf of the estate. As both parties agree, however, that Will was never probated. Pennsylvania law provides that suit may only be brought by the personal representative of the decedent, meaning the administrator or executor of the estate. Gee v. CBS, Inc., 471 F. Supp. 600, 616 (E.D. Pa. 1979) (citing 20 PA. CONS. STAT. §§ 3372, 3373). For an executor or administrator to be appointed to administer the estate, a petition would have to be made for a grant of letters of administration or letters testamentary pursuant to 20 PA. CONS. STAT. §§ 3151 and 3155. Plaintiff has not produced any such letters testamentary.

whether the present form of TKW – the 2007 partnership between Dawn and James Casale – is the successor-in-interest to the 1999 partnership.

Under the Uniform Partnership Act, dissolution of partnership is caused by the death of any partner. 15 PA. CONS. STAT § 8353(4); see also Hansel v. Hansel, 446 A.2d 1294, 1298 (Pa. Super. Ct. 1982). "The termination of a partnership is markedly different from the dissolution of a partnership. When a partnership has terminated it ceases doing business; when a partner effects a dissolution it simply means that partner is no longer associated with the business of the partnership." Canter's Pharm., Inc. v. Elizabeth Assoc., 578 A.2d 1326, 1329 (Pa. Super. Ct. 1990). Upon dissolution, the partnership continues until there is a "winding up" of partnership affairs. 15 PA. CONS. STAT. § 8352. Once dissolution occurs, however, the authority of the surviving partner to act for the partnership is limited to acts necessary to wind up partnership affairs or to complete those begun, but not then finished. 15 PA. CONS. STAT. § 8355.

While these rules would suggest that the 1999 partnership was effectively dissolved upon the death of Marguerite Casale, the Uniform Partnership Act may be trumped by agreement. Under well-established jurisprudence, the Uniform Partnership Act applies only in the absence of a partnership agreement addressing the effect of the death of a partner on continuation of the business. See Girard Bank v. Haley, 332 A.2d 443, 446 (Pa. 1975); see also Custer v. Somerset Manor Assoc., 4 Pa. D. & C. 5th 225, 230 (1989) ("[t]he general principle of law is that the death of a general partner dissolves the partnership . . . *unless otherwise agreed.*" (emphasis added)); 56 AM. JUR. PARTNERSHIP § 724 ("parties may make a binding agreement that the surviving partner may continue the partnership business after the death of one of the partners, without liquidation by the surviving partners and with or without the participation of the decedent's legal representative or the

30

substitution of the person acquiring his or her interest.").

As indicated above, Plaintiff, in this case, has produced a Partnership Agreement – albeit an

unexecuted version – which provides for continuation of the partnership in the event of one of the

partners' deaths as follows:

> A Partner's membership in the Partnership shall be automatically terminated upon
> the occurrence of any of the following events:
>
> (A) The Partner's death by any cause whatsoever
>
> . . .
>
> Except as otherwise expressly provided in these Articles of Partnership, and despite
> any contrary provision now existing or later recognized to be existing in the law of
> Pennsylvania, the Partnership shall not be dissolved, terminated or extinguished upon
> the withdrawal of any individual Partner from membership or assignment of
> Partnership interest, but instead the Partnership shall endure and be continued by the
> remaining Partners or Partner.

(Pl.'s Opp'n Mot. Summ. J., Ex. 6 §§ 7.3, 7.5.) "Upon the termination of any Partner's

membership in the Partnership, such Partner shall have no further interests in or claim against the

Partnership or Partnership assets other than those rights expressly contained in the Eighth article of

this Agreement . . ." (Id. § 7.6.) Taking this Partnership Agreement per its terms, the 1999

partnership between Marguerite Casale and James Casale did not terminate upon Marguerite's

death, but rather survived and was continued under the direction of James Casale.[12]

_____

[12] Notably, this type of provision comports with Pennsylvania law. The Pennsylvania Supreme
Court has recognized that where the business of a firm is carried on by the surviving partners in
the firm name and at the same place, after the death of a partner, by and with the knowledge and
consent of his administrator without arrangement for dissolution of the firm or closing its
business, it will be considered that the administrator exercised his right of election to continue
the business under the provision of the partnership agreement that, in case of death of a partner
during the term of the partnership, his administrators might elect that the business continue for
the benefit of the persons entitled under deceased. Evans v. Watts, 43 A. 464, 465 (Pa. 1899)

31

Nevertheless, the Court still faces the issue of Plaintiff's failure to produce an executed version of the Partnership Agreement, thereby making the admissibility of its contents questionable. To that end, the Court returns to Federal Rule of Evidence 1004, which states that "[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if— . . . (1) **Originals lost or destroyed.** All originals are lost or have been destroyed, unless he proponent lost or destroyed them in bad faith." FED. R. EVID. 1004. "The decision whether to admit a writing under any of the exceptions in Rule 1004 is left to the discretion of the trial judge." U.S. ex rel. Magid v. Wilderman, No. CIV.A.96-4346, 2004 WL 1987219, at *3 (E.D. Pa. Aug. 18, 2004) (citations omitted).

In this case, there is no evidence that the Partnership Agreement was lost or stolen in bad faith. James Casale stated that the document was openly available for viewing during the reading of his mother's Last Will and, after the nearly twenty family members present were disbursed, the agreement could not, despite reasonable search, be found. (J. Casale Decl. ¶ 15.) Moreover, as set forth above, Plaintiff has provided ample circumstantial evidence as to the contents of the Partnership Agreement. James Casale avers that he and Marguerite Casale entered into such an agreement and that the version provided to this Court is a true and correct copy of the same agreement as electronically maintained by his law office. (J. Casale Decl. ¶¶ 8, 16.) Finally, Dawn Casale attests to seeing the signed Partnership Agreement and states that "[t]he document identified as the Articles of Partnership between Marguerite Hawco Casale and James F. Casale attached to my brother's declaration appears to be identical to the document my mother showed me." (D. Casale Decl. ¶ 7.) Given this evidence, the Court concludes that "a reasonable juror could be convinced that the copy is accurate." Guy C. Long, Inc. v. Insul/Crete Co., Inc., No. CIV.A.92-

32

4987, 1993 WL 218901, at *4 (E.D. Pa. June 18, 1993) (citing 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE, ¶ 1004(1)[03], at 1004-11, ¶ 1008[5], at 1008-17 (1992)).

In light of these conclusions, the Court may now draw the reasonable inference – as permitted by Federal Rule of Civil Procedure 56 – that the 1999 partnership continued after the death of Marguerite Casale, under the express terms of the 1999 Partnership Agreement.[13] Thereafter, in September of 2007, James Casale entered into a new Partnership Agreement with his sister, Dawn Casale, to formalize Marguerite's intent, expressed in her prior wills, that Dawn join the business, and to make Dawn Casale a formal partner in TKW. (Pl.'s Opp'n Mot. Summ. J., Ex. 3.) Indeed, the 2007 Partnership Agreement expressly noted that the partnership was created to "formalize the role of Dawn P. Casale as an equal partner to James F. Casale in the ownership and operation of The Knit With" and "for the *continued* growth and expansion of The Knit With." (Id. (emphasis added).) Because there was no winding up or termination of the 1999 partnership and the business was simply carried on by the 2007 partnership, the Court concludes that a reasonable factfinder, faced with such evidence, could determine that the present form of TKW – as memorialized by the 2007 partnership agreement – is in fact the successor-in-interest to the 1999 partnership form of TKW. In turn, the present Plaintiff would be the real party in interest in this

---

[13] Alternatively, even if the Court were to find that the 1999 partnership was terminated upon Marguerite Casale's death and that James Casale operated TKW alone until entering into a partnership with Dawn Casale in 2007, summary judgment would not be the appropriate remedy. Federal Rule of Civil Procedure 17(a)(3) states that, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." FED. R. CIV. P. 17(a)(3). Thus, if the Court were to deem James Casale the real party in interest in this case, the proper course of action would be to allow Plaintiff to substitute him as the actual plaintiff.

33

matter. Given this genuine issue of material fact, the Court cannot grant KFI Defendants' Motion for Summary Judgment.[14]

## IV. CONCLUSION

In short, after unnecessarily complicated, and somewhat confused, argument by the parties, the Court finds that KFI Defendants have failed to meet their burden of proving the absence of a genuine issue of material fact as to the real party in interest. Plaintiff has come forth with substantial and material evidence suggesting that James and Marguerite Casale intended to – and indeed did – enter into a partnership in 1999 with respect to the operation of TKW. That partnership remained intact during the time of the challenged sales of yarn in this case. After Mrs. Casale's death, James continued the partnership before restructuring it to include his sister, Dawn Casale, as partner and making it a successor-in-interest to the 1999 partnership of TKW. While KFI Defendants have pointed to the absence of letters of administration and the disregard of various formalities by the Casale family with respect to the structuring of TKW, they have failed to prove that no reasonable juror could conclude that Plaintiff TKW is the real party in interest to this case. Accordingly, the Motion for Summary Judgment is denied.

---

[14] In light of these findings, the Court declines to delve into the inherently perplexing subject of the effect of Marguerite Casale's Will. As noted above, although her Last Will and Testament appointed James Casale as executor and left him virtually all of her possessions, that Will was never probated. Accordingly, Letters of Administration were never issued in connection with Marguerite Casale's estate and a personal representative capable of pursuing any claims of Marguerite Casale's estate was never appointed. In Pennsylvania, the Orphans' Court possesses exclusive original jurisdiction over all matters regarding the "administration and distribution of the real and personal property of decedents' estates." 20 PA. CONS. STAT. § 711(1). Thus, such an action cannot be brought in a federal court. See Bosley v. Bosley, No. CIV.A.07-1380, 2008 WL 2048665, at *3 (M.D. Pa. May 12, 2008). To resolve this issue, then, the Court would have to order the parties to have Marguerite Casale's Will probated and ensure that a personal representative is appointed, who could then authorize distribution of Mrs. Casale's partnership share to James Casale.

34