# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KNITTING FEVER, INC., | : | |
| DESIGNER YARNS, LTD., | : | |
| FILATURA PETTINATA V.V.G. DI | : | |
| STEFANO VACCARI & C., SION | : | NO.  08-4221 |
| ELALOUF, DIANE ELOUF, JEFFREY J. | : | |
| DENECKE, JR., JAY OPPERMAN, and | : | |
| DEBBIE BLISS, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EISAKU NORO & CO., LTD., | : | |
| KNITTING FEVER, INC., | : | |
| SION ELALOUF, DIANE ELALOUF, | : | NO.  08-4775 |
| and JAY OPPERMAN, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                          July 19, 2012

Currently pending before the Court is a Motion for Summary Judgment on Counts IV and

V of Plaintiff's Complaint filed by Defendants Knitting Fever, Inc. ("KFI"), Sion Elalouf, and

Jay Opperman (collectively, "Defendants" or the "KFI Defendants").  For the following reasons,

the Motion is granted and judgment is entered in favor of Defendants on Counts IV and V of the

Complaint.

## I.      FACTUAL AND PROCEDURAL HISTORY

The factual background of this case is one familiar to both the parties and the Court, and has been reiterated in several of this Court's prior opinions.[1]  This matter arises between Plaintiff, TKW, a small, family-owned and operated business retailing specialty yarns and accessories to consumers, and Defendants (a) KFI, a New York corporation that imports and distributes specialty yarns; (b) KFI's officers and directors, including Sion Elalouf, Diane Elalouf, Jay Opperman, and Jeffrey J. Denecke, Jr.; and (c) Filatura Pettinata V.V.G. Di Stefano Vaccari & C. ("Filatura"), Debbie Bliss, and Designer Yarns, Inc. ("Designer Yarns"), all of whom are non-U.S. entities that design, manufacture, and/or distribute speciality yarns.  At the core of the dispute is Plaintiff's claim that KFI sold designer knitting yarns to TKW, representing that the yarns contained a percentage of cashmere, which the yarns allegedly did not.

Following extensive motion practice by both parties, the Court has dismissed multiple claims and Defendants.  The sole claims remaining in this action are:  (1) injury to business and property pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962 against Defendant Sion Elalouf; (2) conspiracy to cause injury to business and property pursuant to RICO, 18 U.S.C. §1962(d) against Defendants Sion Elalouf and Jay Opperman; and (3) a piercing the corporate veil allegation against Defendants KFI, Sion Elalouf, and Diane Elalouf.  In addition, the KFI Defendants have counterclaims for defamation, tortious interference with existing and prospective contracts, and trade libel.

---

[1]  See The Knit With v. Knitting Fever, Inc., No. Civ.A.08-4221, 2008 WL 5381349, at *1–6 (E.D. Pa. Dec. 18, 2008); The Knit With v. Eisaku Noro, No. Civ.A.08-4775, 2008 WL 5273582, at *1–3 (E.D. Pa. Dec. 18, 2008); The Knit With v. Knitting Fever, Inc., Nos. Civ.A.08-4221, 08-4775, 2011 WL 891871, at *1–2 (E.D. Pa. Mar. 10, 2011).

On March 30, 2012, the KFI Defendants filed the current Motion for Summary Judgment on Counts IV and V of Plaintiff's Complaint.  Plaintiff responded on April 16, 2012, Defendants filed a Reply on May 21, 2012, and Plaintiff submitted a Sur-reply on May 31, 2012.  This Motion is now ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

Defendants currently seek summary judgment on Counts IV and V of the Complaint, which are the causes of actions alleging violations of the RICO statute and conspiracy to violate RICO respectively. In support of this Motion, the KFI Defendants put forth two arguments. First, they assert that Plaintiff does not have statutory standing to pursue these alleged violations. Second, they contend that, even assuming Plaintiff could prove statutory standing, Plaintiff nonetheless cannot satisfy any of the other substantive requirements of a RICO claim predicated on mail or wire fraud. Because the Court finds that Defendants' standing argument precludes

4

Plaintiff from further pursuing its RICO actions, the Memorandum focuses solely on discussion of that issue.

Section 1964(c) of the RICO statute confers standing to pursue a RICO cause of action as follows:

> Any person *injured in his business or property by reason of a violation of section 1962 of this chapter* may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

18 U.S.C. § 1964(c) (emphasis added). Given this unequivocal language, it has become well settled that the plaintiff cannot prevail upon a Section 1962(c) claim unless he has been injured in his business or property by the conduct constituting the violation. Sedima v. S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). In other words, to establish standing under Section 1964(c), "a RICO plaintiff [must] make two related but analytically distinct threshold showings . . . : (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962." Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000) (footnote omitted); see also In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 246 (3d Cir. 2012). Although "RICO is to be read broadly, . . . section 1964(c)'s limitation of RICO standing to persons injured in their business or property has a restrictive significance[.]" Maio, 221 F.3d at 483 (internal citations and quotations omitted). The limitation "helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." Id.

With respect to the injury component of the standing inquiry, the United States Court of

Appeals for the Third Circuit has noted that, "[i]n ordinary usage, 'injury to business or property' does not denote physical or emotional harm to a *person*.  Indeed the Supreme Court has declared that Congress's limitation of recovery to business or property injury 'retains restrictive significance.  It would for example exclude personal injuries suffered.'"  Genty v. Resolution Trust Corp., 937 F.2d 899, 918 (3d Cir. 1991) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979)); see also Vavro v. Albers, No. Civ.A.05-321, 2006 WL 2547350, at *21 (W.D. Pa. Aug. 31, 2006) (noting that personal injuries, physical pain, mental distress, and financial injuries that derive therefrom, are not compensable under RICO), aff'd, 254 F. App'x 134 (3d Cir. 2007).  Moreover, injury to "valuable intangible property" is normally not the type of property which is capable of incurring a concrete financial loss.  Anderson v. Ayling, 396 F.3d 265, 271 (3d Cir. 2005) (quoting Steele v. Hosp. Corp. of Am., 36 F.3d 69, 70 (9th Cir. 1994)).  Therefore, to prove standing under 18 U.S.C. § 1964(c), a plaintiff must proffer "proof of a concrete financial loss and not mere injury to a valuable intangible property interest."  Maio, 221 F.3d at 483 (quotation omitted).

    As to the proximate cause component of the standing inquiry, "[t]here must be a direct relationship between the injury asserted and the injurious conduct alleged, and only where proximate cause exists does a plaintiff have standing to raise a RICO claim."  Cont'l Cas. Co. v. Slonchka, No. Civ.A.04-1587, 2005 WL 2176834, at *8–9 (W.D. Pa. Aug. 18, 2005).  This standard requires a showing (1) that the defendant's alleged RICO violation was the "but for" cause of his injury; and (2) that the violation was the direct or proximate cause of the injury.  Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 265 (1992).  Thus, a RICO plaintiff who complains of "harm flowing directly from the misfortunes visited upon a third person by the defendant's acts" may not recover under § 1964(c).  Id. at 268–69.

6

In the present case, Plaintiff's Preliminary Assessment of Damages sets forth five types of RICO injuries incurred as a result of Defendants' purported conspiracy to distribute mislabeled yarns: (1) attorneys' fees; (2) cost of investigation and recall; (3) cost of replacement goods; (4) harm to goodwill and reputation; and (5) cost of and lost profits from the yarns at issue.[2] (Defs.' Mot. Summ. J., Ex. 8). Defendants now contend that none of these categories of damages suffice to establish concrete injury to business or property proximately caused by Defendants' alleged RICO violations. In response, Plaintiff argues that:

> Here, the party most directly injured by Defendants now-conceded fraudulent scheme to mislabel wool products is the class of retailers upon whom the success of the fraud depended. . . . Defendants invite the Court to commit reversible error to conclude ultimate victims are more proximately injured despite the presence of a more directly affected victim: the retailer.
>
> Rather than accept the law as it is Defendants disregard the delivery of misbranded wool products directly and inevitably led to TKW's injuries. The claimed injury—being supplied with mis-labeled, non-conforming goods by Defendants (and their use of a commercial interstate common carrier to effect delivery)—is the cause of TKW's injury. No superceding [*sic*] causal factor intervened to interrupt the causal chain between Defendants' failure to ascertain the composition of their products, Defendants' misrepresentation their products contain the purported amounts of cashmere and acrylic, their delivery of the products and TKW's subsequent inability to legally re-sell these products to consumers. That TKW was unaware until Summer, 2006 of its injured status does not negate its injury. Nor the absence of knowledge of injury interrupt the direct and proximate causal connection between TKW's injury and Defendants' injurious conduct.
>
> Finally, Defendants identify TKW's damages as resulting from its business injury. Each item of damages Defendants cite are recoverable actual damages under a commercial breach of warranty theory. Defendants cite no caselaw to the contrary.

(Pl.'s Resp. Opp'n Mot. Summ. J. 6–7.)[3]

---

[2] Plaintiff does not dispute that this list constitutes the full extent of damages for which it seeks RICO recovery.

[3] The Court notes that, other than this cited passage, Plaintiff's Response and Reply Briefs completely fail to address the viability of its alleged RICO damages and whether it has

Faced with these competing arguments, the Court must now determine whether Plaintiff has, in fact, established—or, at a minimum, created a genuine issue of material fact as to the question of—concrete damage to injury or property that was proximately caused by Defendants' alleged RICO violations.  To do so, the Court considers each category of Plaintiff's claimed damages individually.

A.      **Attorneys' Fees**

The first, and largest, element of Plaintiff's damage claim is its request for attorneys' fees.  In particular, Plaintiff's principal and attorney, James Casale, has billed over $2 million in damages.  (Defs.' Mot. Summ. J., Ex. 3, Dep. of Dawn Casale ("D. Casale Dep."), 153:18–23, Oct. 24, 2011.)  Defendants now assert that, as a matter of law, a *pro se* plaintiff cannot recover his own attorneys' fees under RICO and, in any event, such damages were not proximately caused by the alleged violations.

As set forth above, Section 1964(c) allows for the recovery of "a reasonable attorney's fee" in the event a RICO violation is found.  Such fees, however, "cannot form the basis for RICO liability."  Walter v. Palisades Collection, LLC, 480 F. Supp. 2d 797, 805 (E.D. Pa. 2007).  This principle is based on the notion that, "[i]t would be illogical to allow a plaintiff to have RICO standing based on damages incurred by the plaintiff in paying his attorney to file the RICO action.  RICO's injury requirement would be a nullity if paying an attorney to initiate the RICO

---

satisfied the requisite elements for standing under RICO.  Indeed, in large part, Plaintiff disregards the standing argument and focuses its briefing on Defendants' secondary arguments regarding the substantive RICO elements.  In an effort to give Plaintiff every benefit of the doubt, however, the Court considers some of the arguments that Plaintiff could have, but did not, raise.

    Moreover, to the extent that Plaintiff assumes throughout its briefing that Defendants have "conceded" the existence of a fraudulent scheme, its assumption is mistaken.  Defendants concede the fraudulent scheme *solely* for the purpose of addressing whether or not Plaintiff would have statutory standing under RICO to seek redress for such a scheme.

action itself suffced as a damage." Id.; see also Shirokov v. Dunlap, Grubb & Weaver, PLLC, No. Civ.A.10-12043, 2012 WL 1065578, at *29 (D. Mass. Mar. 27, 2012) (rejecting plaintiff's argument that the attorneys' fees incurred in a RICO action are an injury sufficient to confer standing under RICO under the RICO injury requirement); Martinez v. Quality Loan Serv. Corp., No. Civ.A.08-7767, 2009 WL 586725, at *9 (C.D. Cal. Feb. 10, 2009) ("[T]he cost of filing a RICO action does not satisfy the concrete financial injury requirement."); PennMont Secs. v. Frucher, 502 F. Supp. 2d 443, 467–68 (E.D. Pa. 2007) (finding that legal fees that are not proximately caused by any predicate act are not "injury" for purposes of RICO standing).[4]

In the present matter, Plaintiff seeks attorneys' fees incurred in the filing of the present action. In an effort to defend these damages as cognizable RICO injuries, Plaintiff focuses on the proposition that attorneys' fees—even those incurred by a *pro se* plaintiff—constitute recoverable damages under RICO.[5] At no point, however, does Plaintiff attempt to prove that such damages were proximately caused by the predicate acts themselves. Without deciding whether such damages would be recoverable in the context of this case if Plaintiff were to succeed on its RICO action, the Court finds that such damages in and of themselves are

---

[4] Notably, courts have found attorneys' fees to constitute concrete financial injury when those fees were expended as an intended consequence of a defendant's racketeering actions. See Evans v. City of Chicago, No. Civ.A.00-7222, 2001 WL 1028401, at *5 (N.D. Ill. Sept. 6, 2001) (holding that, where plaintiff alleged RICO violation resulting from police officers' unlawful actions causing him to be subject to false charges, plaintiff's claims of injuries resulting from attorneys' fees expended to defend against those false charges constituted concrete injury to his property that could be shown to have been proximately caused by the officers' unlawful conduct). These types of attorneys' fees are drastically different than attorneys' fees incurred in seeking recourse under a RICO cause of action for the RICO violations.

[5] To the extent Defendants engage in extensive discourse to argue that a *pro se* attorney cannot recover his attorneys' fees under the RICO statute, the Court need not address this proposition. The question before the Court is whether Plaintiff even has RICO standing to bring such an action.

insufficient to confer RICO standing.  Otherwise, Plaintiff, in the absence of any other injury

caused by Defendants' purported conspiracy, could obtain standing simply by initiating a lawsuit.

Accordingly, these fees fail to provide the requisite concrete financial loss resulting from the

alleged RICO violations from which this Court can find statutory standing.

###    B.    <u>Costs of Investigation and Recall</u>

The next grouping of damages identified by Plaintiff is costs of investigation of the

conspiracy and recall of the allegedly mislabeled yarn, including: (1) transportation costs; (2)

fiber analysis expenses; (3) recall administrative expenses; (4) consumer reimbursements; (5)

dedicated staff time; (6) non-legal professional fees incurred; (7) interest on loans that Mr. Casale

made to the business; and (8) storage an miscellaneous expenses.  (Defs.' Mot. Summ. J., Ex. 8.)

Defendants now contend that these alleged damages did not directly result from any alleged

predicate acts, but rather from the *discovery* of the alleged predicate acts.

As discussed in detail in this Court's March 10, 2011 Memorandum, Plaintiff's RICO

statement alleged two separate RICO conspiracies:  (1) the conspiracy between two of the KFI

Defendants and some of the now-dismissed Defendants to distribute mislabeled yarn—a scheme

carried out by the various predicates acts of Sion Elalouf; and (2) the conspiracy between the KFI

Defendants and some of the now-dismissed Defendants to cover up the initial fraudulent plans.

<u>The Knit With v. Knitting Fever, Inc.</u>, Nos. Civ.A.08-4221, 08-4775, 2011 WL 891871, at *8

(E.D. Pa. Mar. 10, 2011).  The Court thereafter dismissed any cause of action based on the latter

conspiracy, since Plaintiff failed to prove that it suffered any damages resulting from the

purported cover-up.  <u>Id.</u> at *11.  Accordingly, what remains is the scheme and related conspiracy

to distribute mislabeled yarn.  Plaintiff now bears the burden of proving that its injuries relating

to the recall of the alleged mislabeled yarn and investigation of the alleged RICO conspiracy

were proximately caused by Defendants' predicate acts in furtherance of its plan.

To properly analyze this issue, the Court must consider the element of proximate causation in more depth.  "[T]he compensable injury flowing from a [RICO violation] 'necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'" Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 457 (2006) (quoting Sedima, 473 U.S. at 497).  A RICO violation is said to have proximately caused an injury if the violation is "a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence."  Prudential Ins. Co. of Am. v. U.S. Gypsum Co., 828 F. Supp. 287, 293 (D.N.J. 1993) (internal quotations omitted).  This proximate cause inquiry requires a court to consider "such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection."  Id. (quoting Brandenburg v. Seidel, 859 F.2d 1179, 1189 (4th Cir. 1988)).  "Accordingly, while a RICO plaintiff and defendant may have a direct and not a derivative relationship, the causal link between the injury and the conduct may still be too weak to constitute proximate cause—because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes." Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 614 (6th Cir. 2004).  Drawing from the United States Supreme Court decision in Holmes v. Securities. Investor Protection Corp., 503 U.S. 258 (1992), the Third Circuit has identified three "formal factors of proximate cause in RICO":

> (1) the directness of the injury—"the more indirect the injury, 'the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to [defendant's wrongdoing], as distinct from other, independent, factors;'"
> (2) the difficulty of apportioning damages among potential plaintiffs—"allowing recovery by indirectly injured parties would require complicated rules for apportioning damages;" and
> (3) the possibility of other plaintiffs vindicating the goals of RICO—"direct victims

could generally be counted on to vindicate the policies underlying" RICO in a better manner than indirect victims.

Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 443 (3d Cir. 2000) (quoting

Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 932 (3d

Cir. 1999) (quoting Holmes, 503 U.S. at 268–69))).  Ultimately, proof of causation must be such

as to suggest probability rather than simple possibility, "precisely to guard against raw

speculation by the fact finder."  Sakaria v. Trans World Airlines, 8 F.3d 164, 172–73 (4th Cir.

1993) (citations omitted).

As a general rule, incidental damages where the plaintiff was not the target of the

conspiracy, as well as damages incurred by a direct target in investigating and mitigating

damages, are generally not deemed direct injury flowing from a defendant's illegal conduct.  On

this point, a survey of several pertinent RICO cases is instructive.  First, in Hecht v. Commerce

Clearing House, Inc., 897 F.2d 21 (2d Cir. 1990), a discharged employee sued his former

employer under Section 1962(c) for loss of future commissions when he was discharged for

failing to aid or abet alleged RICO violations by his employer and co-employees targeted at the

employer's customers.  Id. at 22.  The court declined to accord him RICO standing because

"[a]lthough [Plaintiff's] loss of employment may have been factually caused by defendants'

RICO violations, it was not a foreseeable natural consequence sufficient for proximate

causation."  Id. at 24.  For similar reasons, the court found that plaintiff's injury from loss of

commissions, as a result of customers canceling subscriptions upon discovering the frauds, did

not confer standing because he was neither the target of the racketeering enterprise nor the

competitor, nor the customer of the racketeers.  Id.  "[T]he injury to [Plaintiff] from customers'

deciding to cancel subscriptions or to withdraw business upon discovering the frauds was not

reasonably foreseeable as a natural consequence of the RICO violations."  Id.

12

Second, in Strates Shows, Inc. v. Amusements of America, Inc., 379 F. Supp. 2d 817 (E.D.N.C. 2005), plaintiff, a family-owned carnival midway company, brought a RICO action against defendant, a competing company, who allegedly made illegal campaign contributions to the Commissioner of Agriculture in order to unlawfully secure the award of the right to the midway contract at the state carnival.  Id. at 821–22.  Plaintiff claimed that it was injured by defendants' racketeering activity in three respects: (1) the failure to award the midway contract to plaintiff, which, but for defendants' activity, would have been awarded to it; (2) costs incurred in the preparation of its bid proposals that were never seriously considered; and (3) legal fees and costs in pursuing a bid protest.  Id. at 826.  The court declined to find any RICO injury, holding that the failure to award the midway contract was an injury to mere expectancy interests or an intangible property interest; that the costs in preparing bids would have been incurred regardless of defendants' illegal activity; and that the legal fees in pursuing the bid protest were "not 'direct' injury flowing from defendants' illegal conduct, but rather, at best, 'indirect' injury which plaintiff did not automatically incur, but chose to incur, in mitigating the effect of defendants conduct."  Id. at 826–33.

Additionally, in Rylewicz v. Beaton Services, Ltd., 698 F. Supp. 1391 (N.D. Ill. 1988), aff'd, 888 F.2d 1175 (7th Cir. 1989), the defendants allegedly engaged in a conspiracy to threaten and intimidate one of the plaintiffs into not testifying in another litigation involving plaintiff's company.  Id. at 1393–94.  In the subsequent RICO action brought by the plaintiffs, they alleged, in part, that they suffered damage to their business and property because they were "forced to expend considerable time, effort and money investigating the defendants' conduct."  Id. at 1395. The Court found that "pecuniary losses, which occur incident to non-compensable RICO injuries are . . . non-compensable."  Id. at 1396.  Consequently, it held that "the cost of any investigation

13

conducted with regards to the plaintiff's termination from [his employer] or to the reduction of the pool of potential settlement funds represents an injury that cannot be compensated under RICO. . . . [and that] the pecuniary losses incurred during [the plaintiffs'] investigation of the defendants' conduct which caused the injuries are also non-compensable under the RICO statute." Id.

Finally, in Hollander v. Flash Dancers Topless Club, 340 F. Supp. 2d 453 (S.D.N.Y. 2004), the plaintiff brought a RICO action against an alleged global criminal enterprise involved in drug trafficking, money laundering, immigration fraud, prostitution, pornography, extortion and fraud, with the intent "to infiltrate and expand its illegal and ancillary legal activities into hard currency markets, especially the United States." Id. at 455.  Plaintiff claimed that he was lured into this enterprise upon marriage to his wife—a member of the enterprise—and, when he became suspicious of his wife's activities, he "launched an investigation that continues to the present day and ended up diverting [plaintiff] from his law and consulting business for two years." Id. at 456.  The court found that, to the extent plaintiff sought compensation for loss of profits, business interruption expenses, loss of business opportunities, and investigation expenses, such injuries were neither contemplated by the RICO statute nor proximately caused by the scheme at issue.  Id. at 459.  It went on to note that, according to Plaintiff's own complaint, the conspiracy was not directed at the plaintiff, but at generating profits in the United States from its illegal activities.  Id. at 461.  The court commented that "courts routinely find that the proximate cause requirement is not met, and plaintiffs lack standing to assert a civil RICO claim, where the plaintiff's injuries are caused not by the RICO violations themselves, but by the exposure of those acts . . ." Id. at 459–60.  Thus, "the damages [the plaintiffs] seek[] arise from his discovery of the alleged Scheme, and not from the original purpose of the Scheme itself or

any of the acts taken to effect that Scheme." Id. at 460.  The Court remarked "[t]hat plaintiff would put his legal and consulting businesses on hold to investigate the Enterprise simply is not a reasonably foreseeable consequence of the predicate acts alleged; indeed, plaintiff's resistance to and investigation of the Scheme is what the predicate acts, as alleged, were designed to prevent." Id.  As a result, the court found no injury and causation within the meaning of section 1964(c). Id.

        While not factually similar, the aforementioned cases are all legally similar in one key respect:  the courts in those cases repeatedly found that although the plaintiffs' injuries resulting from discovery and mitigation of a RICO scheme may have been *factually* caused by the defendants' illegal actions, the injuries were not *proximately* caused—*i.e.*, there was no direct link—by the defendants' actions.  Applying the legal underpinnings of these cases to the present matter, it becomes abundantly obvious that Plaintiff's recall and investigative damages in this action are similarly too remote to provide RICO standing.  According to the RICO Statement filed by Plaintiff in this case, the object of the conspiracy was to distribute handknitting yarns that were falsely labeled and priced as containing a certain amount of cashmere.  (RICO Statement 15.)  The monies expended by Plaintiff in this grouping of damages, however, were not occasioned directly by the predicate acts in furtherance of that conspiracy, but rather by the costs that Plaintiff chose to incur to investigate and mitigate the effects of Defendants' conduct. In other words, the object of the scheme was not to injure the Knit With by having it hire a fiber analyst to test the yarns, pay a family member to remove yarns from the shelves, and then champion the rights of its customers through a highly-publicized recall.  Rather, it was to sell to consumers yarn priced under the guise that it contained a certain quantity of cashmere.  In fact, the success of the alleged scheme was predicated on Plaintiff not discovering the falsely-marked

yarns and continuing to stock and sell to the unwary consumer these mis-labeled yarns.  As in Rylewicz, Strates Shows and Hollander, the expenses incurred in discovering the fiber content of the yarn and recalling the yarns were "not 'direct' injury flowing from defendants' illegal conduct, but rather, at best, 'indirect' injury which plaintiff did not automatically incur, but chose to incur, in mitigating the effect of defendants conduct."  Strates Shows, 379 F. Supp. 2d at 833. Such damages were not reasonably foreseeable consequences of the predicate acts alleged.[6] Accordingly, the Court finds that these claimed elements of damages do not constitute compensable injury under RICO.

### C.    Cost of Replacement Goods

The third element of Plaintiff's alleged RICO damages is $7,854.86 in replacement goods that it purportedly purchased from Cascade Yarns, Inc.—a plaintiff in an identical action against Defendants in the Western District of Washington.  (Defs.' Mot. Summ. J., Ex. 10.)  Presumably, this element refers to yarns that Plaintiff purchased in 2011 to replace the yarns at issue that it pulled from its shelves.  (Id.)

Plaintiff's argument, however, fails in several respects.  First, Plaintiff neglects to explain why it needed to replace these yarns other than to re-stock inventory on which it intended to profit.[7]  Second, it does not establish how its need to purchase other yarns from another supplier proximately resulted from the RICO conspiracy, particularly where Plaintiff has repeatedly

---

[6]  As noted above, Plaintiff also argues, without explanation, that "[e]ach item of damages Defendants cite are recoverable actual damages under a commercial breach of warranty theory." (Pl.'s Opp'n Mot. Summ. J. 6–7.)  Aside from the fact that the Court has dismissed as untimely Plaintiff's breach of warranty theories, the mere fact that certain types of damages are recoverable under a common law, contractual breach of warranty theory does not equate with a finding that such damages under the strict statutory, and legally-distinct, standards of RICO.

[7]  Again, neither Plaintiff's Response brief nor Reply brief address this issue.

admitted that it ceased doing business with KFI in 2005, prior to its 2006 discovery of the alleged

RICO conspiracy.  Thus, as of 2011, when these "replacement" yarns were purchased, Plaintiff

would have had to find another supplier regardless of whether any racketeering scheme existed.

Id.  Finally, as noted by Defendants, Plaintiff is hard-pressed to prove that its purchase of these

replacement goods was an "injury to business or property" within the meaning of RICO.

Plaintiff has admitted that it sold the "replacement" goods to consumers and, in fact, re-ordered

one of the replacement products.  (Defs.' Mot. Summ. J., Ex. 11, Interrog. No. 20.)  Accordingly,

far from being an injury, the replacement goods were a source of revenue for Plaintiff.

     **D.**    <u>**Harm to Goodwill and Reputation**</u>

     Plaintiff's next item on its "Preliminary Assessment of Damages" lists "harm to goodwill

and reputation."  (Defs.' Mot. Summ. J., Ex. 8.)  Notably, however, a Plaintiff may satisfy the

cognizable proof of loss requirement under Section 1964(c) only by allegations and proof of

actual monetary loss.  <u>Maio</u>, 221 F.3d at 483–84 (3d Cir. 2000).  Claimed losses to goodwill and

reputation are not only speculative, but are simply not the types of injuries compensable under

RICO.  <u>Advanced Oral Techs., LLC v. Nutres Research, Inc.</u>, No. Civ.A.10-5303, 2011 WL

198029, at *7 (D.N.J. Jan. 20, 2011) (citing cases); <u>see also</u> <u>Maio</u>, 221 F.3d at 483 (holding that

allegations of damage to such "intangible property interest[s]" are insufficient as a matter of

law; <u>Hamm v. Rhone-Poulenc Rorer Pharms., Inc.</u>, 187 F.3d 941, 954 (8th Cir. 1999) ("Damage

to reputation is generally considered personal injury and thus is not an injury to 'business or

property' within the meaning of 18 U.S.C. § 1964(c)."); <u>Kashelkar v. Rubin & Rothman</u>, 97 F.

Supp. 2d 383, 391 (S.D.N.Y. 2000) (holding that the plaintiff's allegations that, due to the

defendants' actions, his business bank account was frozen for a few months, he was forced to

spend time and money defending himself in lawsuits, and "he experienced difficulty with his

personal insurance coverage" were insufficient to establish injury for a RICO claim).

Given the well-established nature of this law, the Court finds that Plaintiff's claimed "harm to goodwill and reputation" does not constitute a cognizable issue upon which Plaintiff can rest RICO standing.  Nor does Plaintiff cite to any jurisprudence to suggest otherwise.  Accordingly, the Court finds that this element of Plaintiff's alleged damages is not actionable under 18 U.S.C. § 1964(c).

**E.**     **Cost of and Lost Profits from the Yarns at Issue**

The final element of damages claimed by Plaintiff is the cost of the yarns at issue and the lost profits associated with those yarns.  Specifically, Plaintiff asserts that, over the course of eight years of dealing with KFI, it purchased $9,702.50[8] of the yarns at issue.  As an alleged result of Defendants' purported scheme to distribute mislabeled yarns using the mails and wires, Plaintiff claims to have suffered losses in the form of (a) the costs of the yarns at issue and (b) lost profits expected from the sale of that yarn.  Defendants now contend these elements neither constitute injury to business or property nor are proximately caused by any of the alleged predicate acts.[9]

---

[8]  The full amount Plaintiff actually claims it purchased is $10,127.50.  This figure, however, includes $425 for an alleged shipment of Cashmerino yarn in 2005.  As set forth in this Court's Memorandum of June 27, 2012, Plaintiff has failed to adduce any probative evidence that this shipment occurred.  Knit With v. Knitting Fever, Inc., Nos. Civ.A.08-4221, 08-4775, 2012 WL 2466616, at *16 (E.D. Pa. June 27, 2012).  Accordingly, the Court deducts it from the total amount.

[9]  As with the other elements of damages, Plaintiff has completely failed to make any argument in its briefing as to why this element constitutes a cognizable injury in fact under RICO.  In an abundance of caution, however, the Court attempts to glean Plaintiff's argument from its expert report and its Preliminary Assessment of Damages, attached as exhibits to Defendants' Motion for Summary Judgment.

18

1.    **Actual Cost of the Yarns at Issue**

As to the cost of the yarns at issue, the Court finds that there has been no concrete injury

to Plaintiff's business or property.  According to the report of Plaintiff's damages expert, Robert

Harris, between 2004 and 2006—prior to when Plaintiff discovered the alleged problem with the

cashmere content—it sold these yarns for a total of $19,694.90.  This amount does not reflect any

sales of the yarns at issue during the previous six years of stocking these yarns and is $9,992.40

more than Plaintiff actually paid for its entire stock of the mislabeled yarns.  (Id.)  Taking into

account its claimed "consumer reimbursements" of $3,812.45, Plaintiff still had, at minimum, a

profit of $6,179.95 on sales of the allegedly mislabeled yarn.  (Defs.' Mot. Summ. J., Ex. 8.)

Given these facts, Plaintiff is now hard-pressed to establish a concrete financial *loss*.  As Mr.

Harris specifically testified:

> Q.    So in the first line of the discussion section you say that, "Accountants understand an adverse event as an occurrence resulting in an unexpected increase to expenses or reduction to revenue or an event which materially affects the ability of the business to carry on."  So, in other words, an adverse event is something that damages the business, correct?
> A.    Yes.
> Q.    What's the opposite of an adverse event?
> A.    That would be a positive event.
> Q.    So a positive – so something that makes a business money would be a positive event?
> A.    Yes.
> Q.    And so instead of damaging the business, the positive event helps the business correct?
> A.    Yes.
> Q.    So up until The Knit With stopped selling the products at issue here, it was making money, correct, on the sale of these products?
> A.    Yes.
> Q.    It wasn't selling them below cost, right?
> A.    No.
> Q.    Selling them above cost?
> A.    Yes.
> Q.    So it was making money for the business, correct?
> A.    Yes.

> Q.      And that benefitted the business, correct?
> A.      Yes.  That's why every business is in business.

(Defs.' Mot. Summ. J., Ex. 2, Dep. of Robert Harris ("Harris Dep."), 291:6–292:23, Feb. 24,

2012.)  Having already recouped the cost of the yarns at a profit, thereby benefitting from the

Defendants' purported misrepresentations, Plaintiff cannot now claim concrete financial injury

allowing it to make a double recovery from actual cost of those yarns.  See Maio, 221 F.3d at 483

(holding that RICO standing requires allegations of proof of actual monetary loss); Walters, 480

F. Supp. 2d at 804 (same).

### 2.      Lost Profits

Mr. Harris's report also claims lost profit damages in two forms.  The first loss of profits,

in the amount of $6,928.75, results from the sales lost related to the prohibition of the re-sale to

consumers of mis-labeled wool products.  (Defs.' Mot. Summ. J., Ex. 14.)  Stated differently, it

is the "sales which would have been derived from the re-sale to consumers of wool products had

the adverse event not occurred."  (Id.)  The second loss of profits is prospective profits, in the

amount of $13,782.31, resulting from Plaintiff's loss of customers who have ceased buying

products from The Knit With.  Mr. Harris opines that, because of the mislabeled yarns and the

recall, many customers ceased doing business with Plaintiff, thus causing what he terms

"goodwill damages."  (Id.)

As to the latter form of lost profits, the Court has already held that damages, even

monetary damages, incurred as a result of injury to reputation or goodwill are not compensable in

a RICO action.  See Vavro, 2006 WL 2547350, at *21 (noting that financial injury that derives

from an intangible injury is not compensable under RICO).  Indeed, as noted by the United States

Supreme Court, a company's "lost sales could have resulted from factors other than [the] alleged

acts of fraud.  Businesses lose and gain customers for many reasons, and it would require a

20

complex assessment to establish what portion of [the plaintiff's] lost sales were the product of [the defendant's predicate racketeering acts.]"  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 459 (2006); see also Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 495 (3d Cir. 1987) ("[A] breach of contract or warranty may lead to *non-recoverable* loss of goodwill where defendant's breach causes customer dissatisfaction with the plaintiff which is then translated into a loss of expected profits.") (emphasis added).  Likewise, in this case, the reputational damage alleged in this case is entirely speculative, as Plaintiff has produced absolutely no proof that the customers that stopped purchasing yarn from Plaintiff did so as a result of the recall as opposed to other factors.  These damages, being non-compensable under RICO, cannot confer RICO standing.

With respect to the first form of lost profits—the profits lost due to Plaintiff's inability to legally sell its remaining inventory of the allegedly mislabeled yarns under the Wool Products Labeling Act, 15 U.S.C. § 68, et seq.—the inquiry is somewhat more complicated.  It is well-settled that "lost profits, or expectancy damages are recoverable under RICO, subject to proof of proximate causation and that the damages are not speculative."  Frankford Trust Co. v. Advest, Inc., 943 F. Supp. 531, 533–34 (E.D. Pa. 1996).  In other words, courts have held that "where the 'damages sustained' by a victim of a RICO violation include lost profits, there is no bar to a recovery of those losses."[10]  AAMCO Transmissions, Inc. v. Marino, Nos. Civ.A.88-5522, 88-

---

[10]  This Court remains cognizant of cases finding that a mere expectancy interest is insufficient to allege injury to business or property under RICO.  See, e.g., Heinold v. Perlstein, 651 F. Supp. 1410 (E.D. Pa. 1987) (holding that claim that seller induced buyer to purchase a diamond ring by misrepresenting value of diamond was insufficient to allege injury necessary to state a cause of action under Racketeer Influenced and Corrupt Organizations Act in absence of a showing that seller's alleged wrongful conduct caused buyer to pay more than fair market value for ring); Korman v. Trusthouse Forte PLC, No. Civ.A.89-8734, 1990 WL 83353, at *6 (E.D. Pa. June 15, 1990) (holding that the injuries that plaintiffs suffered which were caused by the alleged

6197, 1992 WL 38120, at *5 (E.D. Pa. Feb. 20, 1992) (citing cases).

      The burden, however, falls on the plaintiff to establish that the profits are both specific and identifiable, and are not speculative in nature.  Altamont Summit Apartments, LLC v. Wolff Props., LLC, Nos. Civ.A.01-1260, 2002 WL 926264, at *14 (D. Or. Feb. 13, 2002) ("[A] claimant must support a claim for lost profits, like any other claim for RICO damages, with factual allegations that show the injury is not speculative.").  "Injuries that are speculative or prospective in nature are insufficient to confer standing."  In re Am. Honda Motor Co. Inc. v. Dealerships Relations Litig., 941 F. Supp. 528, 540 (D. Md. 1996); see also Magnum v. Archdiocese of Phila., 253 F. App'x 224, 228–29 (3d Cir. 2007) ("Congress did not intend to recognize a cause of action in civil RICO where the damages from the injuries are 'speculative.'"); Altamont, 2002 WL 926264, at *15 (finding that plaintiffs failed to identify the source of their calculations of alleged lost profits and, therefore, failed to establish a "concrete" loss of profits); Frankford, 943 F. Supp. at 534 ("Of course, recovery of lost profits should be subject to the ordinary limitations concerning remoteness (or proximate cause) and speculativeness (or certainty).") (quotation omitted); World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 521 (S.D.N.Y. 2007) ("[A] plaintiff who alleges injuries that are 'indefinite and unprovable' does not have standing under, and cannot recover damages pursuant to, RICO."), aff'd, 328 F. App'x 695 (2d Cir. 2009).

      In the present case, while Plaintiff's claim of lost profits due to its inability to re-sell mislabeled yarns is theoretically cognizable under RICO, Plaintiff fails to sustain its burden of proving that the injury is not speculative and indefinite.  As indicated above, Plaintiff's chart of

---

fraudulent representations did not include an expectancy plaintiffs had in profits that could be realized when it sold the business).  Given that the Court finds Plaintiff's lost profit calculation to be entirely speculative, the impact of these cases need not be addressed.

purchases shows that, during an eight-year period, from August 20, 1997 to July 29, 2004, it purchased and stocked $9,702.50 worth of the yarns at issue.  (Defs.' Mot. Summ. J., Ex. 12.) From January 2004 to August 2006 *alone*—a less than three year period—it sold $19,694.90 worth of those yarns, leaving yet unanswered the question of how much inventory it sold prior to June 2004.  (Id., Ex. 14.)  Mr. Harris then opines, and in turn Plaintiff claims, that The Knit With suffered loss profits of almost $7,000 on its remaining inventory of the mislabeled yarns when it discovered the RICO scheme two years later in 2006.  Mr. Harris's sole explanation for this figure is as follows:

> In 2006, The Knit With experienced what accountants term an adverse event.  This adverse event results from the discovery the client has been supplied mis-labeled yarn products.  The affected products are *Debbie Bliss Baby Cashmerino*, *Debbie Bliss Cashmerino Aran*, *KFI Cashmereno*, and three Noro yarns: *Amagi*, *Cash Iroha* and *Lotus*.  The adverse event is a consequence of the prohibition under federal law of the sale of mis-labeled wool products.  With respect to the six yarns, the client has experienced lost sales in the amount of $6,928.75.
> . . .
> What accountants analyze as a loss of sales can be described as the loss of primary profits: in any sales transaction, the sale event is the primary profit opportunity; without a sale there can be no profit.

(Defs.' Mot. Summ. J., Ex. 14.)  Thereafter, in his deposition, Mr. Harris testified that the $6,928.75 figure actually represents the cost of the yarns, plus a 100% markup (Harris Dep. 152:2–153:24), meaning that the actual lost *profits* would be only one-half of that figure, *i.e.* $3,464.[11]  Crucially, at no point in Mr. Harris's expert report, Mr. Harris's deposition, or any

---

[11]

Q.      And so what does the 7,000 number represent?

A.      Okay.  I don't know how much they had in total because some was taken away to be analyzed.

Q.      Right.

A.      The amount of yarn on hand that was unsaleable or unmerchantable because of the discrepancy from the report that the analyst said totaled $6,928.75.

Q.      And that's the total sales?

document provided to this Court does Plaintiff detail the most basic figures for arriving at this lost profit calculation, including exactly how much of the allegedly mislabeled yarn it had in stock, the precise cost of that remaining yarn, or the exact markup of that yarn.  Nor does Mr. Harris's report explicitly account for the existence of competition in the area, the consumer demand for this type of yarn, and how much of that particular yarn it expected to sell in light of the market conditions prevailing at the time of the discovery.   Indeed, Mr. Harris explained that his entire basis for determining market trends for knitting yarn was based on what his non-expert client told him.[12]  (Harris Dep. 150:2–20.)

_____

> A.   Well, that wouldn't be the total sales, that's the total gross profit that would be missing.  My client typically marks up, I think this one somewhere around 114 or 118 percent.  Most other yarns in the business are anywhere from 150 to 200 or 300 percent, depending on the type of item it is.  And I opted to be conservative and reasonable and I took 100 percent markup because that's what he would have sold it for.  Sixty-nine plus the cost of 69 would be double that, but I'm only interested in 6,900 because I'm taking a conservative tact.  He should be reimbursed for the costs, but the lost profits in it would be the gross sales, because if you don't have a top line you can't possibly have a bottom line.  So the yarn that he has that is unsaleable would have sold for double, more than double, of what's there but he can't sell any of it.  So I took hundred percent markup as opposed to 114 or higher.
>
> Q.   But is the $7,000 number, is that revenue or profit?
>
> A.   Both.
>
> Q.   No, no.  They're not interchangeable terms.
>
> A.   Well, in this case, it practically is because he marks up.

(Harris Dep. 152:2–153:24.)

> [12]
>
> Q.   Yes, but what is your basis for that belief that that actually occurs, that when you have a bad economy, people stay home [and knit] instead of going out?
>
> A.   Because I asked my client why.  He told me they were cyclical.  I asked him why.  He gave me an answer.  And I relied on that answer and I believe it's correct.
>
> Q.   Why do you believe it's correct.
>
> A.   Because he told me, and I've never known him to lie.
>
> Q.   If he told you that yarn sales go up during full moons, would you believe that too?
>
> A.   If he says it, it must be true.

Even more disconcerting is that, Mr. Harris's logic is completely untenable to even the most untrained eye.  Applying his analysis to his listed past sales figures, Plaintiff would not have had enough inventory of the yarns at issue in 2006 to reach his lost profits figures.  If Plaintiff bought a grand total of $10,127.50[13] of the yarns at issue and sold them at its highest likely markup rate (per Mr. Harris) of 118%, it would have had gross revenues totaling $22,077.95.  Yet, according to Mr. Harris's report, in a span of less than three years—despite stocking and selling the yarns for almost nine years—Plaintiff sold a total of $19,694.90.  Assuming that Plaintiff *never* sold *any* of yarns at issue prior to January 2004—a broad and unlikely assumption in and of itself—Plaintiff should have had only approximately $2,383.05 left worth of marked up yarn in 2006.[14]  Yet, somehow, Mr. Harris, without any explanation, arrives at a figure of $6,928.75 worth of marked up yarn.  Given this rather large discrepancy, which already gives Plaintiff the benefit of several idle assumptions, Mr. Harris's opinion makes the recoverability of lost profits in this case even more indefinite, speculative, and unprovable.  As such, the Court cannot find that Plaintiff has met its burden of proving any lost profits which constitute actual financial loss.

Having had the luxury of years of discovery, Plaintiff has had ample opportunity to document its alleged lost profits resulting from Defendants' alleged conspiracy to distribute mislabeled yarn.  Notwithstanding this extensive discovery period and the fact that all documents relevant to this issue were within its own possession, Plaintiff has failed to show lost profits that

---

(Harris Dep. 150:2–20.)

[13]  This figure uses the alleged $425 purchase of Cashmerino in 2005 since Mr. Harris would have used this figure in his report.

[14]  Using Mr. Harris's more "conservative" estimate of a 100% markup, Plaintiff should logically not have had *any* inventory of the yarns at issue remaining in 2006.

go beyond the most basic level of speculativeness.  Indeed, Plaintiff's expert report reflects a

complete absence of *any* documented or factual basis for calculating lost profits with any

reasonable certainty.[15]  To accept such a report would completely abrogate the RICO statute's

requirement of "concrete financial loss" that is both definite and provable.  As speculative lost

profit damages are insufficient to confer RICO standing, Plaintiff cannot rest its case on this

element of damages.

**IV.     CONCLUSION**

In light of the foregoing, the Court is constrained to find that Plaintiff lacks statutory

standing to pursue a cause of action under the RICO statute against Defendants for the alleged

scheme to distribute mislabeled yarns.  All of Plaintiff's enumerated damages either do not

constitute concrete financial loss to business or property or were not proximately caused by

Defendants' predicate acts in furtherance of the scheme.  Absent such a showing, Plaintiff cannot

prevail upon a § 1962 claim.  Maio, 221 F. 3d at 483.  Accordingly, the Court must grant

judgment to Defendants on Counts IV and V of Plaintiff's Complaint, which now results in a

judgment in favor of Defendants on the entirety of that Complaint.

---

[15]  Although the Court denied without prejudice Defendants' Motion to Preclude Mr. Harris's Expert Testimony pending both the Court's ruling on the Motions for Summary Judgment and the rescheduling of trial, the Court would be highly inclined to exclude Mr. Harris's report under the Federal Rules of Evidence.